Filed 11/23/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B306088 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA091171) |
| v. | |
| OMAR RIGO RAMIREZ, | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Lee W. Tsao, Judge. Reversed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Michael Katz, Deputy Attorneys General for Plaintiff and Respondent.

———————————

Omar Rigo Ramirez appeals from a postjudgment order denying his petition for resentencing under Penal Code section 1170.95[1] as to his conviction of first degree murder under a theory of felony murder based on his participation in an attempted carjacking. After an evidentiary hearing, the trial court concluded Ramirez was not eligible for resentencing because he was a major participant in the underlying felony and acted with reckless indifference to human life, within the meaning of section 189, subdivision (e)(3). Ramirez contends substantial evidence does not support the trial court's findings. We agree and reverse.

Ramirez did not provide the murder weapon, instruct his confederate to shoot, or know of his confederate's propensity toward violence, and the shooting occurred quickly without Ramirez having a meaningful opportunity to intervene. Although Ramirez was aware his confederate had a gun and intended to use it in the carjacking, as a 15-year-old he may well have lacked the experience and maturity to appreciate the risk that the attempted carjacking would escalate into a shooting and death, and he was more susceptible to pressure from his fellow gang members to participate in the carjacking. Thus, there is not substantial evidence Ramirez acted with reckless indifference to human life.

Ramirez also contends he is entitled on remand to be resentenced by a juvenile court pursuant to Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Cal. Const., art. I, § 32) and Senate Bill No. 1391 (2017-2018 Reg. Sess.) (Senate Bill 1391). We agree Proposition 57 and Senate Bill 1391 apply to Ramirez's resentencing under section 1170.95 and direct the trial

---

[1] All undesignated statutory references are to the Penal Code.

2

court to transfer the matter to the juvenile court, which shall treat Ramirez's remaining convictions as juvenile adjudications and impose an appropriate disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*

We described the 2005 killing of Alex Gutierrez in our prior opinion in *People v. Rios* (May 18, 2011, B218445) [nonpub. opn.] (*Rios*).

1.    *The shooting*

Early on the morning of June 17, 2005 Gutierrez and an unidentified passenger drove to a house on Clarkdale Avenue in Hawaiian Gardens, where Lizbeth and Paola Figueroa (the Figueroa sisters) lived with their family. Gutierrez was a friend of Paola's ex-boyfriend. When Gutierrez arrived, he asked Paola if she wanted to buy stereo speakers. After some discussion, Paola reluctantly agreed to take the speakers so Gutierrez would not disturb the neighbors. Paola had Gutierrez put the speakers in her van and said she would try to sell them. Gutierrez left, but said he would return.

Lizbeth and Paola then drove in the van to an abandoned house on Juan Street, about five blocks away, to try to sell the speakers. One of Lizbeth's friends, Carlos Gallardo was there with five or six other men.[2] Gallardo lived in the neighborhood and was a member of the Varrio Hawaiian Gardens criminal

---

[2]    Gallardo was 18 years old at the time. He testified after entering a no contest plea to voluntary manslaughter and attempted murder.

3

street gang, and the Juan Street house was a regular hangout for members of the gang. Lizbeth called Gallardo over to the van. Paola asked Gallardo if he knew anyone who wanted to buy speakers.

Juan Carlos Rios,[3] who was also a member of the Hawaiian Gardens gang, approached them and demanded to know who gave Paola the speakers. Paola replied that it was "just some friends." Rios asked if they were from his neighborhood, and Paola told him they were not. He asked if they were "gangsters." He also asked if they had guns, a nice car, and money, and whether they looked like "Paisa[s]," meaning Mexican nationals. Paola told him they were Paisas and had no money. Rios responded he "was planning on jacking them."

Rios asked Paola to give him a ride home. He lived on Arline Avenue, near the Figueroa sisters' home. Paola did not want to take Rios home because she was concerned he intended to rob Gutierrez, but she agreed to drive him because she was afraid of him. Rios, Gallardo, and Ramirez got into the van. During the drive, Rios continued to question Paola about Gutierrez and his companion, asking "[i]f they were gangsters, if they had money, what they were driving," as well as whether they were armed. Rios was upset the men from Long Beach were "in [his] city," meaning in Hawaiian Gardens. Rios said "they were going to come up sick status," meaning Rios was "going to try to get whatever they had." Gallardo and Ramirez did not ask any questions. It appeared to Paola that Rios was the leader of the three men.

---

[3]    Gallardo, who was known as "Oner," knew Rios as "Hefty" and Ramirez as "Mono."

When they arrived at Rios's house, Lizbeth heard Rios say something about a gun. Gallardo responded, "Why a gun if they were just Paisas? There is no gun needed." Rios asked, "Well, why not?" Rios went into his home for about five to 15 minutes, then returned to the van. He had [a] sweater[], a white hockey mask, and a "Mexican flag bandanna." Rios kept the mask, gave the sweater to Gallardo, and handed the bandanna to Ramirez. Lizbeth heard Paola tell Rios what kind of car Gutierrez was driving. Rios said he was going to look for the car.

Gallardo suggested that they "punk" or intimidate Gutierrez. Rios wanted to go further than "punking" the victims, which to Gallardo meant probably using a weapon. Gallardo believed he, Rios, and Ramirez were going to Clarkdale Avenue to carjack Gutierrez and the companion.

The Figueroa sisters, Rios, Gallardo, and Ramirez then went to the sisters' home. After Lizbeth and Paola went inside the house, the three men stayed outside, then about an hour later Gallardo knocked on the door and asked for some tacos. Paola gave the men tacos, then drove them back to Rios's home. She dropped them off and returned home. Rios, Gallardo, and Ramirez later returned to the sisters' house and again waited outside. According to Gallardo, they were looking for the Paisas. After some time, they started walking around the neighborhood.

Meanwhile, Gutierrez drove to his father's house in Compton. David Quesada, who worked for Gutierrez's father, had finished work at around 3:00 a.m., when he saw Gutierrez outside the house. Quesada asked Gutierrez to drive him home to Long Beach, so Quesada would not have to take the bus. Gutierrez agreed, but he asked Quesada to accompany him first to Hawaiian Gardens, where Gutierrez was going to pick up

5

money for a completed job. Gutierrez and Quesada[4] then drove to the Figueroa sisters' house.

Rios, Gallardo, and Ramirez saw Gutierrez's car make a U-turn on Clarkdale Avenue and come to a stop on the street. Gallardo thought the occupants of the car looked like Paisas. Rios, who was wearing the hockey mask, approached the driver's side of Gutierrez's car and asked Gutierrez for a cigarette. Gutierrez said he did not have one. Rios whistled, and Gallardo and Ramirez, whose faces were covered, ran to the passenger's side of the car from behind a nearby van, which belonged to the Figueroa sisters' cousin. Rios drew a gun and told Gutierrez to park the car and get out. He told Quesada in Spanish that nothing would happen to him if he got out of the car. Gallardo was closer to the vehicle than Ramirez, who was a couple of feet behind him. Quesada started to get out of the car. Rios was arguing with Gutierrez, who then began to drive away.[5] Rios fired several shots at the car. One of the bullets struck Gutierrez, who lost control of the vehicle. The car hit the cousin's van, which was parked in front of the Figueroas' house. Quesada was able to help Gutierrez drive to the nearby Bicycle Club casino, where a security guard called 911.

Immediately following the shooting, Gallardo asked Rios what he was doing. He told Rios he had made a mess of things

---

[4] According to the trial testimony of the Figueroa sisters, when Gutierrez initially visited the sisters' house that evening to sell the speakers, the passenger in Gutierrez's car was not Quesada.

[5] Gallardo testified Gutierrez started reaching for the glove compartment, at which point Rios fired at him. Gallardo did not see that Rios was holding a gun until the shooting started.

and added, "[Y]ou're on your own."  Gallardo and Ramirez ran in one direction, and Rios ran in another.

Lizbeth and Paola were awakened about 4:00 or 5:00 a.m. by the sound of gunshots and a loud crash.  Paola heard her cousin tell her father that the cousin's van had been hit by gunshots.

Los Angeles County Sheriff's deputies and paramedics responded to the casino, and other Sheriff's deputies responded to Clarkdale Avenue.  Gutierrez's car was at the casino, with Gutierrez slumped over the steering wheel.  There were bullet holes in the hood and windshield of Gutierrez's car.  The deputies who responded to Clarkdale Avenue observed collision damage to the cousin's van and found shell casings in the street.  Gutierrez died from a gunshot wound to his torso.

About a week after the shooting, Lizbeth saw Rios on the street and told him that people were blaming her for the shooting.  He asked for the names of the people and told her, "I am like your brother.  Just let me know and what happened to them, I could do the same thing to whoever is bothering you."  He added, "[T]hat's what he gets for trying to get crazy and not get [out of] the car."

2.    *Ramirez's interview with Sergeant Hall*

Los Angeles County Sheriff's Sergeant Barry Hall interviewed 15-year-old Ramirez on September 22, 2005.  Sergeant Hall advised Ramirez of his *Miranda* rights,[6] and Ramirez waived his rights.  Ramirez stated he was a member of

---

[6]    *Miranda v. Arizona* (1966) 384 U.S. 436, 471.

7

the Hawaiian Gardens gang and had been in the gang for about a year.[7]

Ramirez acknowledged that on the night of the shooting he heard Rios asking questions about the victims, and he knew Rios was planning a carjacking. He heard Rios say he wanted to "'jack these fools,'" but Rios did not say anything about shooting them. Ramirez wanted to tell Gutierrez to leave the Figueroa sisters alone and depart from the neighborhood. Ramirez did not want to assist Rios in the carjacking, but he felt he had to or Rios would "tell the whole hood," and Ramirez would be killed. Ramirez explained he did not want a gun to be used and did not want to be involved in a "big stupid thing," but Rios insisted.

Ramirez acknowledged that he, Rios, and Gallardo were present during the attempted carjacking. Rios was the one who asked the victims for a cigarette. When Ramirez saw Rios draw a gun, he did not want to be involved in the carjacking. Then Rios "[went] crazy" and told the victims to "[g]et the fuck out [of] the car" or Rios would "blast [them]." It was Rios who shot the gun and killed the victim. Ramirez told Detective Hall, "I ain't down for that. . . . I ain't gonna shoot. It's just me and my two fists. You know, get down." He first claimed that he did not know Rios had a gun until Rios drew it during the attempted carjacking. Ramirez then admitted that he saw Rios with a gun when they were at the Figueroa sisters' home prior to the attempted carjacking, and he knew Rios carried a gun with him.

---

[7]     Los Angeles County Sheriff's Sergeant Phillip Santisteven arrested Ramirez at his home. During the booking process, Ramirez told Sergeant Santisteven that he had been a member of the Hawaiian Gardens gang since he was 10 years old.

8

Ramirez told Sergeant Hall that he knew the victims were from Long Beach.  According to Sergeant Hall, Ramirez explained that "people from other areas, other cities basically just can't be driving through their neighborhood, and that if they are, they're going to get jammed up for being in the neighborhood especially on Juan Street.  He was claiming even the cops don't go down there."  Ramirez explained that if outsiders came to Hawaiian Gardens, the "homeboys will fuckin take all their shit."  After learning of Rios's plans, Ramirez was not intending to steal from the victims.  He was just going to tell them not to come back to the neighborhood.

After Rios opened fire, Ramirez "took off."  Ramirez explained, "I heard a crash, but I didn't know what the fuck was going on.  I was gone."  Rios "took off" by himself.

3.    *Gang evidence*

Los Angeles County Sheriff's Detective Brandt House testified as a gang expert with experience investigating the Hawaiian Gardens and other gangs.  Detective House explained that gang members are territorial and are sensitive to being disrespected.  They gain respect through intimidation.  They perceive people coming into their territory as a threat "unless identified otherwise."

Gang members consider Mexican nationals (Paisas) to be inferior and easy targets for crime because they are unlikely to report crimes against gang members.  Gang members intimidate people in the gang's territory so no one will report crimes committed by the gang members, and it is very rare that people living in gang territory will report gang crimes.

9

Gang members commonly work together to commit crimes, and they are expected to support one another in the commission of crimes. A gang member who fails to do so "would be subject to some type of violence from their gang. They refer to it as being regulated. I would expect him to be regulated in some way, and that could be anywhere from a beating to being murdered, depending on what it was that he did wrong or did not act upon that he should have." A gang member who fails to support fellow gang members might avoid punishment, however, if he has a relative who is a high-ranking member of the gang.

Detective House explained the Hawaiian Gardens gang has existed since the 1950s and has about 1,000 members. The gang's primary activities include assaults, carjackings, vehicle theft, and robberies. He opined Ramirez, Gallardo, and Rios were members of the gang, and Ramirez was a member of the Loquitos clique. Ramirez had gang tattoos, and his uncle was a high-ranking member of the gang, which may have protected Ramirez from gang retribution.

When given a hypothetical mirroring the facts of this case, Detective House opined the crime was committed for the benefit of, at the direction of, and in association with the gang. He explained the gang was "asserting [its] dominance over that neighborhood, over that turf area. They are setting an example for individuals who come from outside of the neighborhood who may want to operate in their turf area without their permission. They are setting an example for what's going to happen to those people if they do that." In addition, Rios and Ramirez would advance the gang's status and their own status in the gang through commission of the crimes.

10

#### 4. *Defense case*

The defense called Sergeant Hall as a witness. Ramirez and Gallardo were both from the same clique of the Hawaiian Gardens gang while Rios was in a different clique. Ramirez knew Gallardo better than he knew Rios.

Sergeant Hall noted that at first, Ramirez claimed he did not do or say anything. Ramirez later admitted he approached the car, put his hand on the car, and told the passenger to get out. Ramirez maintained he did not plan the crime and did not want to approach the car, but Rios insisted. Ramirez did not want to hurt anyone.

### B. *The Jury Verdict and Sentencing*

The jury convicted Ramirez of first degree murder (§ 187, subd. (a); count 1),[8] shooting at an occupied vehicle (§ 246; count 3), and two counts of attempted carjacking (§§ 215, subd. (a), 664; counts 4 & 7).[9] The jury found that in the commission of the murder and the attempted carjackings, a principal personally and intentionally discharged a firearm causing great bodily injury. (§ 12022.53, subds. (b), (c), (d) & (e)(1).) As to the count for shooting at an occupied vehicle, the jury found a principal personally discharged a firearm causing great bodily injury.

---

[8] The operative third amended information alleged in count 1 Ramirez committed the murder while he was "engaged in the attempted commission of the crime of [c]arjacking, within the meaning of Penal Code Section 190.2(a)(17)." The People do not dispute Ramirez was tried and convicted on a theory of felony murder.

[9] The jury found Ramirez not guilty on count 2 of attempted murder; the other counts in the operative information were charged against only Rios and Gallardo.

11

(§ 12022.53, subds. (d) & (e)(1).) As to all four counts, the jury found Ramirez committed the crimes for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

The trial court sentenced Ramirez to consecutive sentences of 25 years to life for murder and 15 years to life for shooting at an occupied vehicle, and it imposed two terms of 25 years to life for the firearm enhancements on the two counts. The court stayed imposition of sentence on the remaining counts and enhancements.

C. *Ramirez's Appeal*

In 2011 we affirmed Ramirez's conviction and sentence. We rejected Ramirez's contention substantial evidence did not support his conviction of shooting at an occupied vehicle as a natural and probable consequence of aiding and abetting the attempted carjacking. We reasoned, "Ramirez's own statement confirms that he knew Rios had a gun and was planning a carjacking. He also stated that he did not want Rios to use a gun in the commission of the carjacking. It is reasonably inferable from this statement that he was subjectively aware that Rios's gun use might escalate from brandishing the gun to firing the gun if the victims resisted. Moreover, a reasonable person in Ramirez's position would have foreseen that victims in a car would attempt to drive away rather than be carjacked, and Rios would shoot at the car to stop them. [Citation.] [¶] There thus is substantial evidence from which a reasonable trier of fact could conclude that shooting at an occupied motor vehicle was a natural and probable consequence of the attempted carjacking. Ramirez's conviction of that charge as an aider and abettor must be affirmed." (*Rios, supra*, B218445.)

12

We also rejected Ramirez's claim that his sentence constituted cruel and unusual punishment because he was 15 years old when he committed the offenses.

D. *The Petition for Resentencing, Evidentiary Hearing, and Ruling*

On February 14, 2019 Ramirez filed a form petition for resentencing seeking to vacate his murder conviction and be resentenced in accordance with recent statutory changes relating to accomplice liability for murder. In his petition, Ramirez declared he "was convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine" and he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019." He also checked the box on the form stating he was not the actual killer and did not act with the intent to kill. Further, he asserted he was not a major participant in the felony or did not act with reckless indifference to human life.

The trial court ordered the People to file a response to the petition and appointed counsel to represent Ramirez. Ramirez later retained private counsel. On October 3, 2019 the trial court issued an order to show cause and set an evidentiary hearing.

On January 17, 2020 Ramirez filed a motion for a transfer to juvenile court pursuant to Proposition 57 and for a hearing under *People v. Franklin* (2016) 63 Cal.4th 261 to allow him a sufficient opportunity to make a record of information relevant to a future youth offender parole hearing under section 3051, subdivision (b)(3). Ramirez argued his eligibility for resentencing under section 1170.95 "makes [his] case non-final, effectively

13

triggering a transfer to juvenile court." The People opposed Ramirez's request, arguing Proposition 57 did not apply retroactively to Ramirez's case because his judgment was final.

At the April 28, 2020 hearing, the parties did not present any additional evidence, instead stipulating the trial court could consider the court file, including minute orders, charging documents, transcripts, and the appellate opinion. The trial court found "the People have proved beyond a reasonable doubt that the defendant is ineligible for resentencing." The court found Ramirez was a major participant in the attempted carjacking and acted with reckless indifference to human life. The court observed with respect to whether Ramirez was a major participant, "[Ramirez] was present at the scene of the crime and had a major role in the commission of the underlying felony." As to reckless indifference, the court reasoned Ramirez and "his two companions were members of a criminal street gang," which gave them "a pecuniary motive" and "a territorial motive." Relying on Ramirez's knowledge Rios had a gun, his gang membership, and his statements to Sergeant Hall, the court "infer[red] a degree of knowledge and a willingness to commit violence."

With respect to Ramirez's argument under Proposition 57, the trial court stated, "[I]t appears to be clear that [Ramirez] is precluded from seeking relief because this case has long since been final on appeal and that simply requesting a *Franklin* hearing is not enough to take him outside the general rule that the statute which benefits the defendant applies to all defendants whose cases are not final on appeal."

Ramirez timely appealed.

14

# DISCUSSION

A. *The Trial Court Erred in Denying Ramirez's Petition for Resentencing*

    1.    *Senate Bill No. 1437*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony murder rule. (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847-848 (*Gentile*).) New section 188, subdivision (a)(3), provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." New section 189, subdivision (e)(3), in turn, limits the felony-murder rule exception to the malice requirement to circumstances where the People prove the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Senate Bill 1437 also provides a procedure in new section 1170.95 for an individual convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189. (*Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at pp. 842-843.) If the section 1170.95 petition contains all the required information, including a declaration by

the petitioner that he or she was convicted of murder and could not now be convicted of murder because of changes to section 188 or 189 (§ 1170.95, subd. (b)(1)(A)), the court must appoint counsel to represent the petitioner upon his or her request pursuant to section 1170.95, subdivision (c). (*Lewis*, at pp. 957, 959-960.) Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1170.95, subd. (c); *Lewis*, at p. 964.)

If the petitioner makes a prima facie showing under section 1170.95, subdivision (c), the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) At the hearing, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3); see *Gentile, supra*, 10 Cal.5th at p. 853; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 237, review granted Mar. 10, 2021, S266652.)

Section 1170.95, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." Thus, "it is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under section 1170.95, subdivision (d)(3)." (*People v. Rodriguez, supra*, 58 Cal.App.5th

16

at pp. 243-244, review granted; accord, *People v. Fortman* (2021) 64 Cal.App.5th 217, 224-225, review granted July 21, 2021, S269228; *People v. Clements* (2021) 60 Cal.App.5th 597, 603, review granted Apr. 28, 2021, S267624; but see *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309.)

"We review the trial court's fact finding for substantial evidence." (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087 (*Bascomb*); accord, *People v. Clements, supra*, 60 Cal.App.5th at p. 618, review granted.) "We 'must review "the whole record in the light most favorable to the judgment" and decide "whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*Bascomb*, at p. 1087 [reviewing for substantial evidence trial court's factual finding that petitioner was not eligible for § 1170.95 relief because he was a major participant and acted with reckless indifference to human life]; accord, *Clements*, at p. 618; *People v. Williams* (2020) 57 Cal.App.5th 652, 663; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 277.) "[W]e look to whether the prosecution has introduced sufficient evidence of "'reasonable, credible, and of solid value'" to 'support a finding beyond a reasonable doubt' that [petitioner] had the requisite mental state." (*People v. Clark* (2016) 63 Cal.4th 522, 618 (*Clark*); accord, *Williams*, at p. 663.)

2. *The reckless indifference standard under* Banks*, * Clark*, and* Scoggins

Senate Bill 1437 amended section 189 to limit the scope of the felony-murder rule, requiring the People to prove beyond a reasonable doubt that the defendant "was a major participant in

the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); see § 1170.95, subds. (a)(3) & (d)(3).) "Penal Code section 190.2, subdivision (d), enacted by initiative in 1990, provides that 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant' aids or abets an enumerated felony, including attempted [carjacking], that results in death may be convicted of special circumstance murder and sentenced to death or to life imprisonment without the possibility of parole. The statute, by its text, imposes an actus reus requirement, major participation in the enumerated felony, and a mens rea requirement, reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*); accord, *Clark, supra*, 63 Cal.4th at p. 615; *People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*).) "Section 190.2(d) was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137 . . . , which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 . . . , collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 794; accord, *Clark*, at p. 616.)

In *Banks*, *Clark*, and *Scoggins*, the Supreme Court clarified the scope of section 190.2, subdivision (d), enumerating factors courts must consider in determining whether the totality of circumstances demonstrates a defendant was a major participant in the murder and acted with reckless indifference to human

18

life.[10]  As to whether a defendant acted with reckless indifference to human life, the court specified the following relevant factors: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677; accord, *Clark, supra*, 63 Cal.4th at pp. 618-622.)  ""[N]o one of these considerations is necessary, nor

---

[10]  Because we conclude the People have not met their burden to prove Ramirez acted with reckless indifference to human life, we do not reach whether Ramirez was a major participant in the attempted carjacking.  In *Banks*, the Supreme Court identified the relevant factors in determining whether a defendant is a major participant:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted; accord, *Clark, supra*, 63 Cal.4th 522, 611.)

is any one of them necessarily sufficient.""" (*Scoggins*, at p. 677; accord, *Banks*, *supra*, 61 Cal.4th at p. 803.)

As the *Scoggins* court explained, "Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*Scoggins, supra*, 9 Cal.5th at p. 676; accord, *Banks*, *supra*, 61 Cal.4th at p. 808 ["[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient"; reckless indifference to human life requires "knowingly creating a '*grave risk of death*'"].) "Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*Scoggins*, at pp. 676-677, quoting *Clark, supra*, 63 Cal.4th at p. 617.)

"The crux of that inquiry is '[t]he degree of risk to human life,' and only evidence suggesting an "'elevated . . . risk . . . beyond those risks inherent in any armed robbery'" is sufficient to establish reckless indifference to human life." (*In re Moore* (2021) 68 Cal.App.5th 434, 449 (*Moore*), quoting *Scoggins, supra*, 9 Cal.5th at p. 682.) The use of a gun in the commission of the underlying felony standing alone is not sufficient to support a finding of reckless indifference. (See *Clark, supra*, 63 Cal.4th at p. 617 [observing as to robbery, "while the fact that a robbery involves a gun is a factor beyond the bare statutory requirements for first degree robbery felony murder, this mere fact, on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance"].) Participation "in a garden-variety armed robbery" where "death might be possible but not probable" is insufficient. (*Banks*, *supra*,

20

61 Cal.4th at p. 802; accord, *Bascomb, supra*, 55 Cal.App.5th at pp. 1087-1088.)

In addition, "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life." (*Moore, supra*, 68 Cal.App.5th at p. 454; accord, *People v. Harris* (2021) 60 Cal.App.5th 939, 960, review granted Apr. 28, 2021, S267802.) This is because "'[c]hildren "generally are less mature and responsible than adults"' and '"often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" . . . .'" (*Moore*, at p. 453 [vacating robbery-murder special-circumstance finding, explaining that even if the *Clark* factors supported a finding of reckless indifference for an adult, the 16-year-old petitioner "lacked '"the experience, perspective, and judgment"' to adequately appreciate the risk of death posed by his criminal activities"]; accord, *Harris*, at p. 960 [reversing summary denial of section 1170.95 petition and remanding for evidentiary hearing, observing that "given [petitioner's] youth at the time of the crime, particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that [petitioner] was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants'"].) "Thus, '"the background and mental and emotional development of a youthful defendant [must] be duly considered" in assessing his culpability.'" (*Moore*, at p. 453, quoting *Miller v. Alabama* (2012) 567 U.S. 460, 476.)

21

3. *Substantial evidence does not support the superior court's finding Ramirez acted with reckless indifference to human life*

Considering the totality of the circumstances in the light most favorable to the judgment (*Bascomb, supra*, 55 Cal.App.5th at p. 1087), substantial evidence does not support the superior court's finding Ramirez acted with the requisite mental state of reckless indifference to human life. There is no evidence Ramirez was armed during the felony or supplied the sole murder weapon. Rather, it was Rios who instigated and planned the carjacking, provided the gun, and fired it. Although Ramirez was aware Rios had a gun and intended to use it during the carjacking, that is not sufficient to prove the requisite mental state. (*Clark, supra*, 63 Cal.4th at pp. 613, 618 ["The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."]; *Banks, supra*, 61 Cal.4th at p. 809 [aiders and abettors with simple awareness that confederates were armed and the armed felony carried a risk of death "lack the requisite reckless indifference to human life"]; *Moore, supra*, 68 Cal.App.5th at p. 452 ["Although [petitioner] was aware that [the shooter] had a gun, [petitioner] did not use a gun himself, and there was no evidence he supplied the gun to [shooter]."].)

Nor did Ramirez instruct Rios to use lethal force. (See *Clark, supra*, 63 Cal.4th at p. 619 [although defendant planned armed robbery, substantial evidence did not support finding he acted with reckless indifference to human life where he did not provide the murder weapon, instruct his confederates to use lethal force, or know of confederate's likelihood to kill]; *People v. Williams* (2015) 61 Cal.4th, 1244, 1282 [defendant acted with

22

reckless indifference to lives of victims where he instructed other members of a criminal gang carrying out carjackings to shoot any resisting victims].) And there is no evidence Ramirez was aware Rios had a "propensity for violence." (*Clark*, at p. 621.) To the contrary, Ramirez had reason to expect violence was unlikely given Gallardo's statement to Rios in the van that "no gun [was] needed" because the victims were "just Paisas." As Detective House testified, Paisas are not rival gang members, and they are considered by gang members to be "inferior and easy targets for crime." Although an armed carjacking carries some risk of death, Ramirez did nothing to elevate the risk of the underlying felony beyond those inherent in any armed carjacking. (*Id.* at p. 623; *Banks*, *supra*, 61 Cal.4th at p. 802.)

Ramirez told Sergeant Hall he did not want to participate in the carjacking, but Ramirez feared being killed by the gang if he failed to participate. As Detective House confirmed, a gang member who fails to support his fellow gang members would be subject to a violent reprisal by the gang, ranging from a beating to murder. According to Ramirez, he was not planning to steal from the victims, instead just to direct them not to return to the neighborhood. But Rios insisted on a carjacking, then escalated the plan by getting his firearm. It is true Ramirez did not take any steps to reduce the risk of violence, but given his reluctance to participate in the carjacking, the evidence does not show he acted with a mental state "'encompass[ing] a willingness to kill (or to assist another in killing) to achieve a distinct aim'" (the carjacking). (*Scoggins, supra*, 9 Cal.5th at pp. 676-677, quoting *Clark, supra*, 63 Cal.4th at p. 617.)

Ramirez's presence at the scene of the shooting bears on his culpability. (*Clark, supra*, 63 Cal.4th at p. 619.) Although

Ramirez was present at the scene, at the time of the shooting, he and Gallardo were on the passenger side of the car, and Ramirez would not have had a meaningful opportunity to intervene when Rios—on the driver's side of the vehicle—"[went] crazy" and began to shoot. "Thus, he was not 'close enough to exercise a restraining effect on the crime' or [Rios]." (*Moore, supra*, 68 Cal.App.5th at pp. 441, 452 [aider and abettor sitting in driver's seat of car while confederate robbed and shot victim outside passenger side of car could not have restrained sudden and unprovoked shooting]; accord, *Scoggins, supra*, 9 Cal.5th at p. 679 [where defendant lacked control over the actions of his confederates "once they arrived on the crime scene, especially given how quickly the shooting occurred," defendant was less culpable because he lacked the ability to restrain the crime]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 ["[T]he evidence shows petitioner was in close proximity to the shooting, but it does not show he was close enough to exercise a restraining effect on the crime or his colleagues."].)

Likewise, the rapid pace of the crime does not support a finding of reckless indifference. (*Clark, supra*, 63 Cal.4th at pp. 620-621; *Moore, supra*, 68 Cal.App.5th at p. 452.) The attempted carjacking was executed quickly, providing Ramirez no realistic opportunity to intervene before Rios opened fire. As discussed, Rios approached the vehicle on the driver's side and asked for a cigarette, then drew his gun and ordered the occupants to exit the car. Gallardo and Ramirez approached on the passenger side, and one of them told Quesada to exit. Quesada opened the door to comply, but Gutierrez accelerated, in response to which Rios opened fire. This brief interaction is in contrast to other cases in which "a murder came at the end of a

24

prolonged period of restraint of the victims by defendant," providing a greater opportunity for violence. (*Clark*, at p. 620.)

Ramirez's actions after the shooting also do not support a finding of reckless indifference. Gutierrez's car initially crashed into a parked van, then Gutierrez drove several blocks to call for help. Ramirez fled with Gallardo and did not impede Gutierrez's escape. There is no evidence Ramirez had an opportunity to help Gutierrez after Rios shot at the car or that Ramirez knew Gutierrez had been wounded by the gunfire. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [defendant's failure to assist victim was not sufficient evidence of reckless indifference where "there is no evidence that [defendant] appreciated how badly [victim] was wounded"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1026 [petitioner's flight "[did] not support an inference [he] necessarily understood a killing had occurred"].) And Ramirez did not celebrate the shooting, instead fleeing with Gallardo, who told Rios he had made a mess of things and was "on [his] own." (See *Moore, supra*, 68 Cal.App.5th at p. 453 [juvenile petitioner's failure to aid victim and laughter with his confederates soon after the shooting was insufficient evidence of petitioner's mental state of reckless indifference].)

The trial court based its finding of reckless indifference on the membership of Ramirez, Rios, and Gallardo in the Varrio Hawaiian Gardens criminal street gang, which the court found gave Ramirez both "a pecuniary motive" and "a territorial motive" to kill. But *Banks* cautions against relying too heavily on gang membership where there is no evidence the defendant or his confederates "had ever participated in shootings, murder, or attempted murder, or even that any member of their clique had." (*Banks, supra*, 61 Cal.4th at pp. 810-811 [no substantial evidence

25

that getaway driver acted with reckless indifference to human life where he and two confederates were members of the same gang but there was no evidence confederates had participated in prior shootings, murder, or attempted murder, or that getaway driver knew there would likely be resistance that would provoke lethal force].)  Ramirez told Detective Hall his gang was territorial and that "people from other areas, other cities . . . [are] going to get jammed up for being in the neighborhood especially on Juan Street," where Ramirez claimed even the police did not go.  At trial Detective Hall did not explain what it meant to be "jammed up."  In Ramirez's recorded interview with Detective Hall, however, Ramirez explained the consequence for visiting Hawaiian Gardens from the wrong neighborhood was that the "homeboys will fuckin take all their shit"—not that the outsider would be shot or killed.

Detective House testified the Varrio Hawaiian Gardens street gang "is involved in all manner of crimes," listing the gang's crimes he investigated as aggravated assaults, robberies, carjackings, kidnappings, and theft of vehicles.  He testified gang members gain respect through intimidation, in part by the commission of crimes.  Thus, the gang's "territorial motive" included a willingness to commit violent crimes with the goal of intimating outsiders and the community and furthering the gang's reputation.  But there is no evidence Ramirez sought to enhance his reputation in the gang by escalating the attempted carjacking through the use of lethal force.  Ramirez told Detective Hall that "being a gang member is not about killing fools," although the gang would kill under certain circumstances.

Significantly, Ramirez's youth at the time of the shooting greatly diminishes any inference he acted with reckless disregard

26

for human life by participating in the attempted carjacking knowing Rios was armed.  As argued by Ramirez, the "'hallmark features'" of youth include "'immaturity, impetuosity, and failure to appreciate risks and consequences.'"  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1377, quoting *Miller v. Alabama, supra*, 567 U.S. at p. 477.)  "'[T]he background and mental and emotional development of a youthful defendant [must] be duly considered' in assessing his culpability."  (*Miller*, at p. 476.)  "[T]hey 'are more vulnerable or susceptible to . . . outside pressures' than adults . . . ."  (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272.)  A juvenile's immaturity and failure to appreciate the risks and consequences of his or her actions bear directly on the question whether the juvenile is subjectively "'aware of and willingly involved in the violent manner in which the particular offense is committed'" and has "consciously disregard[ed] 'the significant risk of death his or her actions create.'"  (*Scoggins, supra*, 9 Cal.5th at p. 677; see *Moore, supra*, 68 Cal.App.5th at p. 453; *People v. Harris, supra*, 60 Cal.App.5th at p. 960.)

The People fail to respond to the argument Ramirez's youth should be taken into account in evaluating whether he possessed the requisite culpable mental state.  As we observed in Ramirez's direct appeal, "there was evidence to support a finding that Ramirez was influenced by peer pressure.  He told Sergeant Hall that he did not want to approach the car, but Rios insisted.  He was afraid that if he did not help Rios, the neighborhood would find out and someone might kill him later."  (*Rios, supra*, B218445.)  Although "Ramirez knew there was going to be a carjacking and that Rios was going to use a gun" (*ibid.*), Ramirez's age may well have affected his calculation of the risk of

27

death posed by using the firearm in the carjacking, as well as his willingness to abandon the crime. The evidence is not sufficient to prove 15-year-old Ramirez was "subjectively aware that his actions created a graver risk of death" than any other armed carjacking. (*Moore, supra*, 68 Cal.App.5th at p. 454; see *Scoggins, supra*, 9 Cal.5th at p. 677.)

The People argue our decision in Ramirez's direct appeal supports the trial court's conclusion Ramirez acted with the requisite culpable mental state, pointing to our observation that "[i]t is reasonably inferable from [Ramirez's] statement [to Detective Hall] that he was subjectively aware that Rios's gun use might escalate from brandishing the gun to firing the gun if the victims resisted. Moreover, a reasonable person in Ramirez's position would have foreseen that victims in a car would attempt to drive away rather than be carjacked, and Rios would shoot at the car to stop them." (*Rios, supra*, B218445.) We made these statements in the context of our affirmance of Ramirez's conviction of shooting at an occupied motor vehicle, explaining there was "substantial evidence from which a reasonable trier of fact could conclude that shooting at an occupied motor vehicle was a natural and probable consequence of the attempted carjacking." (*Ibid.*) We reasoned, "It is reasonably inferable that an armed confederate engaged in the commission of a robbery will use his weapon during the course of the robbery, to overcome the victim's resistance, to effect an escape, or even accidentally." (*Ibid.*)

Our conclusion on direct appeal—that there was sufficient evidence Ramirez was guilty of the crime of shooting at an occupied vehicle as a natural and probable consequence of aiding and abetting the attempted armed carjacking—does not mean

28

substantial evidence supports the trial court's finding Ramirez acted with reckless indifference to human life. "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920.) By contrast, "[r]eckless indifference to human life has a subjective and an objective element." (*Scoggins, supra*, 9 Cal.5th at p. 677.) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'" (*Ibid.*) "As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Ibid.*)

Further, in *Rios*, we did not evaluate the sufficiency of the evidence to prove Ramirez's conscious disregard for the significant risk of death created by his actions. And although we concluded there was evidence of Ramirez's awareness of the foreseeable risk Rios would fire shots at Gutierrez's vehicle, "'[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The People's reliance on *People v. Law* (2020) 48 Cal.App.5th 811, review granted July 8, 2020, S262490, and *People v. Williams, supra*, 57 Cal.App.5th 652 is misplaced. In *Law*, the defendant was armed during a home invasion robbery and held the victims at gunpoint while the defendant and his accomplice searched the apartment. The defendant stood by while his accomplice pistol-whipped and physically struggled with one victim before shooting and killing him. (*Law*, at pp. 816-817.) In affirming the trial court's determination the defendant was ineligible for resentencing under section 1170.95 because he was a major participant who acted with reckless indifference to human life, the court observed the defendant had the ability to stop his accomplice's violent behavior or to help the victim after he was shot. (*Id*. at p. 825.) In *People v. Williams*, the defendant and two juvenile confederates planned and executed a robbery, during which the defendant either fired the murder weapon at the fleeing victim or held it shortly before or after it was fired, then fled the scene without calling for assistance or attempting to render aid to the victim who later died. (*Williams,* at pp. 657, 664.) In affirming the trial court's finding the defendant was ineligible for resentencing under section 1170.95, the court explained the defendant's conduct showed he shared in his confederates' actions and mental state, and he had the opportunity to act as a restraining influence as to the robbery and his juvenile accomplices. (*Id*. at p. 664.) In contrast to the defendants in *Law* and *Williams*, Ramirez was not armed and had little ability to intervene given the swiftness of the events and his distance from Rios, who stood on the opposite side of Gutierrez's vehicle.

30

We therefore reverse the trial court's order denying Ramirez's petition for resentencing under section 1170.95 and remand for the court to enter an order granting Ramirez's petition and vacating his murder conviction.

B.    *Ramirez Is Entitled to the Benefit of Proposition 57 on Remand*

Ramirez contends that on remand he should be resentenced by a juvenile court pursuant to Proposition 57 and Senate Bill 1391. We agree and direct the trial court on remand to transfer the matter to the juvenile court for resentencing.

1.    *Proposition 57 and Senate Bill 1391*

"Proposition 57, passed in the November 2016 general election . . . , requires prosecutors to commence all cases involving a minor in juvenile court." (*O.G. v. Superior Court of Ventura County* (2021) 11 Cal.5th 82, 87 (*O.G.*); accord, *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 305-306 (*Lara*) ["'Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing by prosecutors.'"]; *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 711 ["Proposition 57 terminated the prosecutor's ability to file a criminal complaint against a juvenile in the criminal court without first obtaining authority from a juvenile court judge to treat the juvenile as an adult."].)

"As originally enacted, Proposition 57 allowed prosecutors to move to transfer some minors as young as 14 from juvenile court to adult criminal court. [Senate Bill 1391], enacted in 2018, amended Proposition 57 to prohibit minors under the age of 16 from being transferred to adult criminal court. (See Welf. & Inst.

Code, § 707, subd. (a)(1)-(2), as amended by Stats. 2018, ch. 1012, § 1.)" (*O.G., supra*, 11 Cal.5th at p. 87 [upholding the constitutionality of Senate Bill 1391's amendment to Proposition 57]; accord, *People v. Castillero* (2019) 33 Cal.App.5th 393, 399 [under Senate Bill 1391 "individuals who were under 16 years of age when they committed any criminal violation . . . may no longer be transferred to adult/criminal court at all"].)

2.      *Retroactivity of Proposition 57 and Senate Bill 1391*

"In order to determine if a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature, or in the case of a ballot measure, the intent of the electorate." (*Lara, supra*, 4 Cal.5th at p. 307; accord, *People v. Conley* (2016) 63 Cal.4th 646, 656.) In *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the Supreme Court held that statutory amendments that mitigate punishment for an offense apply retroactively to a petitioner who at the time of enactment had committed the offense but had not yet been sentenced. (*Id.* at pp. 742-743, 748.) The court reasoned, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Id.* at p. 745.) Thus, under *Estrada*, "'in the absence of

32

contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*Lara*, at p. 308; accord, *People v. Padilla* (2020) 50 Cal.App.5th 244, 251, review granted Aug. 26, 2020, S263375 (*Padilla*) ["Thus, under *Estrada*, absent indications of the legislative body's contrary intent, courts presume it intended an ameliorative statute to apply retroactively to all nonfinal judgments."].)

Applying this rule in *Lara*, the Supreme Court concluded Proposition 57 constituted an ameliorative change to the criminal law, which the voters intended "'to extend as broadly as possible.'" (*Lara, supra*, 4 Cal.5th at p. 309.) Accordingly, Proposition 57 applies retroactively to "all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Lara*, at p. 304.) The *Lara* court remanded for a retroactive transfer hearing for the juvenile court to determine whether the defendant would have been fit for treatment under juvenile law, and if so, for the juvenile court to treat the convictions as juvenile adjudications and impose an appropriate disposition. (*Id.* at pp. 310, 313.)

Senate Bill 1391, in turn, "effectively broadens the ameliorative benefit of Proposition 57 to 14 and 15 year olds by prohibiting prosecuting attorneys from moving to transfer individuals who commit certain offenses when they were 14 or 15 years old to adult court, unless they were 'not apprehended prior to the end of juvenile court jurisdiction.' . . . Accordingly, Senate Bill No. 1391 applies retroactively to defendants whose judgments are not yet final." (*People v. Hwang* (2021) 60 Cal.App.5th 358, 365, review granted Apr. 14, 2021, S267274

(*Hwang*); *People v. Superior Court (I.R.)* (2019) 38 Cal.App.5th 383, 392-393 [Senate Bill 1391 applies retroactively to nonfinal judgments under *Lara*].)

3. *Determination of whether Proposition 57 and Senate Bill 1391 apply retroactively to Ramirez's resentencing is ripe for review*

Courts may only decide cases that are ripe, and therefore justiciable. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 998 ["[T]he ripeness requirement prevents courts from issuing purely advisory opinions, or considering a hypothetical state of facts in order to give general guidance rather than to resolve a specific legal dispute."]; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 ["The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions."].) "'"A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made."'" (*Alliance for Responsible Planning v. Taylor* (2021) 63 Cal.App.5th 1072, 1082; see *People v. Garcia* (2018) 30 Cal.App.5th 316, 328-329 [defendant's contention exclusion of certain offenders from youth offender parole hearings under section 3051 was unconstitutional was not ripe because juvenile court had not yet decided as part of transfer hearing under Proposition 57 whether defendant's case should be transferred to adult criminal court for disposition because "[i]f the case is not transferred, the constitutionality of section 3051 will be irrelevant"].)

The People contend Ramirez's request for resentencing by the juvenile court under Proposition 57 and Senate Bill 1391 is

34

not ripe because the superior court has not yet addressed his request for a transfer hearing in the first instance.  The People argue that if we reverse the superior court's finding of ineligibility for resentencing, we should remand to the superior court to consider Ramirez's earlier transfer motion, and "[i]f the superior court denie[s] appellant's request, then this second claim would be ripe for this Court to consider on appeal."  However, the People have not identified any facts absent from the record that are necessary to allow """"an intelligent and useful decision to be made"""" by this court on Ramirez's motion.  (*Alliance for Responsible Planning v. Taylor, supra*, 63 Cal.App.5th at p. 1082.)  To require Ramirez to litigate this issue on remand and potentially file a second appeal from the trial court's denial of his motion would prejudice Ramirez, who likely would be released as part of a juvenile disposition.  Moreover, this issue is properly before us because the question whether Ramirez is entitled to the ameliorative benefits of Proposition 57 and Senate Bill 1391 on remand will affect whether we direct the trial court to resentence Ramirez or transfer the matter to the juvenile court for resentencing.

4. *Proposition 57 and Senate Bill 1391 apply retroactively to Ramirez's resentencing*

As discussed, both Proposition 57 and Senate Bill 1391 apply to judgments that were not final at the time of their enactment.  (*Lara, supra*, 4 Cal.5th at p. 304; *Hwang, supra*, 60 Cal.App.5th at p. 365, review granted.)  Ramirez's judgment became final in 2012 (before enactment of Proposition 57 and Senate Bill 1391), when the United States Supreme Court denied

35

his petition for a writ of certiorari.[11]  (See *People v. Vieira* (2005) 35 Cal.4th 264, 306 ["[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed."].)  However, Ramirez contends that under section 1170.95, subdivision (d)(3), on remand he "'shall be resentenced on the remaining charges,'" which renders his sentence nonfinal for purposes of the ameliorative benefits of Proposition 57 and Senate Bill 1391. This contention is persuasive.

Almost all Courts of Appeal that have considered whether Proposition 57 applies retroactively when a criminal court resentences a defendant as to all or part of a previously final sentence imposed on a defendant who was a juvenile at the time of his or her offense have required the criminal court to transfer the case to the juvenile court for a juvenile transfer hearing or a juvenile adjudication.  (See *Hwang, supra*, 60 Cal.App.5th at pp. 366-367, review granted [transfer to juvenile court for juvenile adjudication and disposition required by Senate Bill 1391 upon recall of sentence under section 1170, subdivision (d)(1), where defendant was 15 years old at the time of his offense]; *People v. Lopez* (2020) 56 Cal.App.5th 835, 839, review granted Jan. 27, 2021, S265936 (*Lopez*) [transfer hearing required upon recall of sentence under section 1170, subdivision (d)(1), to correct sentence in light of intervening California Supreme Court decision]; *Padilla, supra*, 50 Cal.App.5th at pp. 253-255, review granted [transfer hearing required following successful petition for writ of habeas corpus]; but see *People v. Federico* (2020) 50 Cal.App.5th 318, 327-328,

---

[11]     *Ramirez v. California* (2012) 567 U.S. 952 [No. 11-7424].

36

review granted Aug. 26, 2020, S263082 [no transfer required upon recall of sentence under section 1170, subdivision (d)(1)].)

Although Division Two of the Fourth Appellate District concluded in *People v. Federico, supra*, 50 Cal.App.5th at pages 327 to 328, review granted, that Proposition 57 did not apply retroactively upon resentencing from a previously final sentence, a different panel of the same court in *People v. Montes* (2021) 70 Cal.App.5th 35 retracted the court's "previous position in *Federico* . . . based on the analyses in *Padilla, Lopez*, and *Hwang*, which we find persuasive" and held transfer to the juvenile court was required on resentencing following a recall of sentence under section 1170, subdivision (d)(2). As the court in *Montes* explained, "On further reflection, we now conclude a resentencing under section 1170, subdivision (d), results in a new sentence—the judgment is no longer final—which entitles the defendant to the ameliorative benefits of Proposition 57." (*Montes*, at pp. 47-48.)

The Courts of Appeal in *Padilla, supra* 50 Cal.App.5th at pages 252 to 253, review granted, and *Lopez, supra*, 56 Cal.App.5th at pages 842 to 843, review granted, in concluding the defendants were entitled to a transfer hearing because their sentences were no longer final, relied on the Supreme Court's decision in *People v. Jackson* (1967) 67 Cal.2d 96 (*Jackson*). We agree the Supreme Court's decision in *Jackson* supports a finding Ramirez's sentence, like those at issue in *Padilla* and *Lopez*, is no longer final. In *Jackson*, the Supreme Court had granted a petition for writ of habeas corpus, reversed the defendant's death sentence, and remanded for a retrial of the penalty phase, after which the defendant was again sentenced to death. (*Id*. at p. 97.) In his direct appeal from his penalty retrial he sought to raise

37

guilt- and penalty-phase claims based on the United States Supreme Court's decision in *Escobedo v. Illinois* (1964) 378 U.S. 478, which was decided after the defendant's initial judgment became final, but before his penalty retrial. (*Jackson*, at p. 98.) The California Supreme Court rejected the defendant's attempt to challenge his judgment of guilt based on the intervening decision in *Escobedo* but allowed him to challenge the penalty under *Escobedo*, explaining the court had reversed only the penalty: "The scope of this retrial is a matter of state procedure under which the original judgment on the issue of guilt remains final during the retrial of the penalty issue and during all appellate proceedings reviewing the trial court's decision on that issue." (*Jackson*, at pp. 98-99.)

The *Padilla* court reasoned, "*Jackson* therefore established that a collateral proceeding may reopen the finality of a sentence for retroactivity purposes, even while the conviction remains final." (*Padilla, supra*, 50 Cal.App.5th at p. 253, review granted.) The court observed Proposition 57 "affects [the defendant's] *sentencing*, independent of its potential effect on his convictions," because "a juvenile disposition is far more advantageous to the defendant than a criminal sentence for the same offense: indeed, 'adult criminal sentencing is the biggest disadvantage to being "tried in adult court . . . ."'" (*Padilla*, at p. 254.) "Because Proposition 57's primary ameliorative effect is on a juvenile offender's sentence, independent of the convictions, we conclude it applies retroactively to appellant's nonfinal sentence and requires that he receive a transfer hearing." (*Id.* at p. 255.) The court considered and rejected the People's argument "it is unlikely the voters intended the provisions of Proposition 57 to apply to those, like appellant, far removed from their teenage

38

years and for whom treatment as a juvenile would likely result in release from custody," relying on the *Lara* court's pronouncement that "Proposition 57 should apply "'as broadly as possible.'"" (*Padilla*, at p. 255.)

Similar to *Padilla*, the Court of Appeal in *Lopez* concluded Proposition 57 applied retroactively to the defendant's resentencing under section 1170, subdivision (d), after his sentence was recalled in light of intervening Supreme Court authority.  (*Lopez, supra*, 56 Cal.App.5th at pp. 839, 845, review granted.)  The *Lopez* court reasoned, "[T]he mere existence of the resentence makes the original sentence irrelevant for the purposes of *Lara*.  Applying *Lara*'s conclusion that Proposition 57 applies retroactively to any judgment that is not final to defendant's new sentence, we conclude the new sentence is not final and so he is entitled to a retroactive transfer hearing in juvenile court.  [¶]  . . .  The original sentence can no longer be considered final for *Estrada* purposes when it has been recalled and modified by the new sentence."  (*Lopez*, at pp. 845-846.)

Although *Padilla* and *Lopez* involved resentencing after a successful petition for a writ of habeas corpus and after recall under section 1170, subdivision (d), respectively, their reasoning applies with equal force to a defendant's resentencing following a successful petition for resentencing under section 1170.95.  Section 1170.95, subdivision (d)(1), requires the superior court upon finding the defendant is eligible for resentencing "to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts *in the same manner as if the petitioner had not been previously been sentenced*, provided that the new sentence, if any, is not greater than the initial sentence."  (Italics added.)  This language is identical to that in

section 1170, subdivision (d)(1), which the *Lopez* court observed "means that the resentencing court should not consider itself bound by any aspect of the previous sentence." (*Lopez, supra*, 56 Cal.App.5th at p. 846, review granted.)

We reject the People's argument that *Estrada*'s presumption of retroactivity should not be extended "to reopened judgments" because it would result in an "uneven, and sometimes arbitrary, application of new ameliorative laws." The Supreme Court recently rejected a similar argument made by the People in objecting to a defendant receiving the benefit of an ameliorative statute after pleading guilty and being placed on probation, then appealing after his probation was revoked and a prison sentence imposed. (See *People v. McKenzie* (2020) 9 Cal.5th 40, 49.) The *McKenzie* court held the defendant's criminal proceeding was not final under *Estrada* at the time the new statute took effect because the time for petitioning for a writ of certiorari in the United States Supreme Court following the defendant's appeal of the prison sentence had not passed. (*McKenzie*, at p. 45.) The *McKenzie* court rejected the People's argument that defendants who do not appeal their convictions and then successfully complete probation are worse off than probationers who violate their probation and have their probation revoked, explaining "[t]hese policy arguments did not persuade us in *Estrada* not to apply ameliorative revisions to defendants who have already committed criminal acts *if* the revisions take effect *before* their 'cases' are 'reduced to final judgment.'" (*McKenzie*, at p. 49.)

As the *Lopez* court observed as to the People's argument that defendants resentenced under section 1170, subdivision (d)(1), would obtain a windfall from application of Proposition 57, "On its face, this argument runs contrary to the

electorate's stated intent that Proposition 57 "'shall be liberally construed to effectuate its purposes,'" one of which is to "'[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles.'"" (*Lopez, supra*, 56 Cal.App.5th at p. 849, review granted, quoting *Lara, supra*, 4 Cal.5th at p. 309.) Likewise, retroactive application of Proposition 57 and Senate Bill 1391 to a defendant's postjudgment resentencing furthers the proposition's and legislation's legitimate goal of reducing the adult prison population. (*O.G., supra*, 11 Cal.5th at pp. 94-95; accord, *Hwang, supra*, 60 Cal.App.5th at p. 366, review granted ["Senate Bill No. 1391 furthers the intent of Proposition 57 'by narrowing the class of minors who would be subject to a lengthy prison sentence in an adult institution.'"].)

Finally, retroactive application of Proposition 57 and Senate Bill 1391 to Ramirez's resentencing is consistent with the full resentencing rule, under which "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 893-894 [defendant whose conviction became final just over a week before Proposition 47 took effect was entitled on remand to a full resentencing, including treatment of his petty theft with a prior conviction as a misdemeanor under Proposition 47]; accord, *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 [full resentencing rule "allows a court to revisit all prior sentencing decisions when resentencing a defendant"].) The Courts of Appeal in *Lopez* and *Montes* applied the full resentencing rule to require a juvenile transfer hearing under Proposition 57 of otherwise final judgments as to sentences

41

recalled under section 1170, subdivision (d).  (See *Montes, supra*, 70 Cal.App.5th at p. 48 [providing defendant with juvenile transfer hearing under Proposition 57 for resentencing under section 1170, subd. (d)(2), "is consistent with the full resentencing rule described in *Buycks*"]; *Lopez, supra*, 56 Cal.App.5th at p. 847, review granted ["The full resentencing rule therefore obligated the trial court here to give defendant a transfer hearing upon his resentencing."].)

Because Ramirez was 15 at the time of the offenses, pursuant to the changes made by Senate Bill 1391 to Welfare and Institutions Code section 707, subdivision (a), Ramirez's remaining counts are not subject to a motion to transfer to adult criminal court.  Therefore, we remand with directions for the trial court to transfer the matter to the juvenile court.  The juvenile court shall treat Ramirez's remaining convictions as juvenile adjudications and impose an appropriate disposition.

## DISPOSITION

The order denying Ramirez's petition for resentencing under section 1170.95 is reversed.  The matter is remanded with directions to enter a new order granting Ramirez's petition and vacating his murder conviction and to transfer the matter to the juvenile court.  The juvenile court is directed to treat Ramirez's remaining convictions as juvenile adjudications and to impose an appropriate disposition.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

43